RECEIVED
IN ALEXANDRIA, LA.

MAY - 3 2010

TONY R. MOORE, CLERK
BY_____
          DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

WILLIAM HENRY SANDERS

-vs-

BELLE EXPLORATION, INC.

CIVIL ACTION NO. 1:07-cv-01108

JUDGE DRELL

MAGISTRATE JUDGE KIRK

## REASONS FOR JUDGMENT

The Court conducted a three-day bench trial in this matter. After the trial was completed, the Court allowed the parties an opportunity to submit additional authorities on a number of designated issues (Doc. 60). Moreover, a Motion to Hold Record Open to Certify Questions to the Louisiana Supreme Court (Doc. 55), filed by the plaintiff, William Henry Sanders ("Mr. Sanders"), remains pending in this case.

I.    **Background**

On July 1, 2000, Mr. Sanders, along with Mr. Ricky E. Shirley ("Mr. Shirley") and their respective wives, executed as lessors an "Oil, Gas and Mineral Lease" ("Lease") with the defendant, Belle Exploration, Inc. ("Belle"). (Joint Exh. 1). The Lease applies to all lands and mineral interests owned by the lessors in Sections 25 and 30, which sections are located in LaSalle Parish, Louisiana. An attachment to the Lease described the land covered by the Lease in more detail, and specified that the lessors would retain a one-fifth royalty interest in any mineral production which took place on the leased property.

In February 2002, the Louisiana State Mineral Board ("Mineral Board") passed

a resolution which stated:

> [T]he Louisiana State Mineral Board does hereby recognize, for mineral rights only, and for local units only, a change in the 36 foot meander line of Catahoula Lake which would cut the state out of an existing producing [sic] currently known as the VUB [SU 116] . . . and lessen the State's participation in a proposed second unit currently known as the VUA [SU 117].

(Joint Exh. 6).[1]  The state thereby conceded to private ownership lands which fall above the 36' mean sea level ("MSL") contour.  The following day, on February 14, 2002, the Commissioner of Conservation ("Commissioner") issued Order No. 773-F-8, which mandated the creation of seven drilling units in the Catahoula Lake Field. (Joint Exh. 5).[2]  These drilling units would be designated sand units ("SU") 116 through 122, and would encompass the land described by the Lease.  Two of the units referenced in the Commissioner's order, SU 117 and SU 118, are pertinent to this lawsuit.

This case was initially filed in the 28th Judicial District Court for the Parish of LaSalle, on June 11, 2007.  (Doc. 1-1).  In his original petition, Mr. Sanders claimed that he leased all land owned by him to Belle, in Sections 25 and 30, for oil, gas, and mineral production.  The Lease provides that, in the event of pooling, each unit must contain a minimum of 20 acres of leased land ("20-acre provision"), while a producing unit of land, under the lease terms, was a unit of forty acres total.  Mr. Sanders sought

---

[1]  A subsequent Mineral Board resolution clarified that the prior resolution quoted above only applied to SU 116 and SU117, did not apply retroactively, and became effective February 13, 2002. (Joint Exh. 7).

[2]  The Commissioner's order was issued after petition for unitization by Belle.  The details of the order, and its impact upon the lease between the parties to this case, will be discussed more fully below.

2

specific performance of the agreement in the form of an order compelling Belle to locate a minimum of 20 acres of leased land in each unit in which Mr. Sanders has an interest.

Mr. Sanders subsequently filed two Supplemental and Amending petitions in state court. The first alleges that Mr. Sanders is entitled to sales and production records, which had allegedly not been disclosed by Belle, and the use of proper drilling practices (such as proper sealing of tank batteries) by Belle, which practices, according to Mr. Sanders, Belle had not followed.[3] Mr. Sanders prayed for specific performance of the royalty and other provisions of the lease, and maintained that the order from the Louisiana Office of Conservation, establishing 7 additional drilling units, did not alter Belle's contractual obligations.[4] The second amended petition claims that Belle's responses and failure to perform under the terms of the lease were in bad faith. Mr. Sanders prays for damages (double the royalties due), interest, fees, and costs, in addition to specific performance.

The suit was removed here on the basis of diversity on June 29, 2007. (Doc. 1). Belle answered the petitions and asserted a number of affirmative defenses, including that Mr. Sanders failed to exhaust administrative remedies, that the obligation to include 20 acres of leased land in a unit does not apply to compulsory units as a matter of law, and that the commission's order of February 14, 2002 supercedes any contractual obligations, including the Lease at issue here, related to

---

[3] Belle's purported failure to use proper drilling practices, in Mr. Sanders's view, contravenes Belle's contractual obligation to drill and produce in a good and workmanlike manner.

[4] We will refer to units created by the Commissioner's order as "compulsory units."

3

royalties on compulsory units. (Doc. 6).

When the suit reached federal court, Mr. Sanders twice more amended his complaint. In his Third Amending and Supplemental Complaint, Mr. Sanders argues that he is entitled to royalty payments under the contract, damages for non-payment, damages for Belle's alleged drilling on a unit containing less than 20 acres of leased land, damages for depreciated value as to contiguous lands, and cancellation of the lease as to a particular zone on which a well was drilled in a unit containing less than 20 acres of leased land. (Doc. 8). Finally, Mr. Sanders filed a fourth amended complaint, alleging that he is entitled to a production factor of .083 on certain compulsory units. (Doc. 28).[5]

II.   **Law and Analysis**

   A.   **The Boundary Line of SU 117**

The State of Louisiana owns the land up to the ordinary high water mark of a navigable lake. See La. Civ. C. art. 450; State v. Placid Oil Co., 300 So. 2d 154, 172 (La. 1974). Additionally, "[t]here is no right to alluvion or dereliction on the shore of the sea or of lakes." La. Civ. C. art. 500. Here, Mr. Sanders's ownership of land within SU 117, which includes part of Catahoula Lake, necessarily begins at the high water mark of the lake, at which point the state's ownership ends. The high water mark was determined by the Louisiana Third Circuit Court of Appeal to be "36 feet MSL, as

---

[5] Belle here argues that the plaintiff's ownership interest within one of the compulsory units, SU 117, was already resolved in Sanders v. State of Louisiana, 973 So. 2d 879 (La. App. 3d Cir. 2007). (Doc. 29). This Court earlier denied a motion for partial summary judgment filed by Mr. Sanders relating to SU 117, because although the Louisiana Third Circuit determined that Mr. Sanders owns the land in SU 117 above the 36' MSL contour line (the ordinary high water mark of Catahoula Lake), that opinion referenced a 1942 land survey which the Court did not have before it at the time. (Doc. 30).

surveyed by Heard and Daigre in 1942." <u>Sanders</u>, 973 So. 2d at 886-87.  The

preclusive effect of this opinion, and the validity of the survey that it relied upon

("Heard/Daigre survey"), were two of the critical questions posed by the parties at

trial.  We find that, in accord with Louisiana courts, the Heard/Daigre survey

indicates the proper placement of the 36' MSL contour line for purposes of both

surface and mineral ownership at all times relevant to this suit.

        1.    <u>Collateral Estoppel</u>

Central to this conclusion is the issue of collateral estoppel vis-a-vis the

appropriate fixing of the 36' MSL contour line.  The Fifth Circuit has provided the

following summary of the doctrine of collateral estoppel as it pertains to federal

cases:

> The doctrine of collateral estoppel applies to prevent issues of ultimate
> fact from being relitigated between the same parties in a future lawsuit
> if those issues have once been determined by a valid and final
> judgment. While complete identity of all parties is not required, the
> party against whom the collateral estoppel would be applied generally
> must either have been a party, or privy to a party, in the prior litigation.

<u>Vines v. Univ. of La. at Monroe</u>, 398 F.3d 700, 704-05 (5th Cir. 2005) (internal citations

omitted).  When a federal court litigant asserts collateral estoppel as to a state court

judgment, however, state rules of preclusion must be applied.  <u>See</u> <u>*In re* Plunk</u>, 481

F.3d 302, 307 (5th Cir. 2007).

The controlling Louisiana statute, La. R.S. § 13:4231, "embraces the broad

usage of the phrase 'res judicata' to include both claim preclusion (res judicata) and

issue preclusion (collateral estoppel)." <u>Certified Fin., Inc. v. Cunard</u>, 838 So. 2d 1, 6

(La. App. 1st Cir. 2002).  The portion of that statute directly pertaining to collateral

5

estoppel provides as follows:

> Except as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:
>
> . . . .
>
> (3) A judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, with respect to any issue actually litigated and determined if its determination was essential to that judgment.

La. R.S. § 13:4231. "Under issue preclusion or collateral estoppel . . . once a court decides an issue of fact or law necessary to its judgment, that decision precludes relitigation of the same issue in a different cause of action between the same parties." Certified Fin., Inc., 838 So. 2d at 6. The doctrine of collateral estoppel must be strictly construed, and only applies in attempts to relitigate issues which have been determined in prior lawsuits between the "same parties." Foley v. Entergy La., Inc., 946 So. 2d 144, 156-57 & n.4 (La. 2006). We note that the requirement of "[i]dentity of parties can also be satisfied when a privy of one of the parties is involved." Burguieres v. Pollingue, 843 So. 2d 1049, 1054 (La. 2003) (citing Welch v. Crown Zellerbach Corp., 359 So. 2d 154, 156 (La. 1978).

The Louisiana Supreme court recently interpreted the "same parties" requirement, as it applies to collateral estoppel, and reaffirmed that "the preclusive effect of an earlier judgment could bind a nonparty plaintiff whose interests were adequately represented by parties to the prior litigation." Williams v. Orleans Levee Dist., No. 2009-C-2637, 2010 WL 1302918, at *1 (La. Apr. 5, 2010) (citing Forum for Equality PAC v. McKeithen, 893 So. 2d 738 (La. 2005)). In that case, the plaintiff, in

6

parallel litigation, had fully litigated the issue of whether he was lawfully terminated against his former employer, the Orleans Levee District, and was denied relief by the Louisiana First Circuit Court of Appeal.  See Williams v. Orleans Levee Dist. and its Bd. of Comm'rs, 24 So. 3d 307, 310-311 (La. App. 4th Cir. 2009).  In subsequent litigation raising essentially the same issue, but involving the State of Louisiana ("State), the Louisiana appellate court held that res judicata did not apply, because the State was not a defendant in the prior litigation.  Id. at 314.  In a unanimous opinion, the Louisiana Supreme Court reversed, emphasizing that preclusion was being applied against the plaintiff, who was a party to the prior litigation and had a "full and fair opportunity to litigate" the issue, albeit against a separate defendant. See Williams v. Orleans Levee Dist., 2010 WL 1302918, at *1.[6]  Thus, the court found that the State was entitled to assert the doctrine of collateral estoppel, despite the fact that the State was not a party to the litigation in the First Circuit.  See id.

In this dispute's long litigation history, a similar but reversed situation seems to have arisen.  A prior judgment of the Louisiana Third Circuit Court of Appeal ("Third Circuit") fixed the boundary of ownership between Mr. Sanders and the State of Louisiana at the 36' MSL contour line.  See Sanders v. State of Louisiana, 973 So. 2d 879 (La. App. 3d Cir. 2007).  Specifically, the court held that "the ordinary high water mark in 1812 was 36 feet MSL as surveyed by Heard and Daigre in 1942."  Id. at 887.

---

[6]  The court's bases for reversing the Louisiana Fourth Circuit's decision were unusually expanded beyond traditional res judicata concepts to include protection against "'the expense and vexation attending multiple lawsuits, conserv[ation of] judicial resources, and foste[ring] reliance on judicial action by minimizing the possibility of inconsistent decisions.'"  See Williams v. Orleans Levee Dist., 2010 WL 1302918, at *1 (quoting Taylor v. Sturgell, 553 U.S. 880 (2008)).

The court carefully examined the geological and documentary evidence surrounding the controversy, and affirmed the validity of the Heard/Daigre line as the correctly surveyed ordinary high water mark of Catahoula Lake.[7]

   In his opening remarks at trial here, Mr. Sanders accepted that the 36' MSL contour is the boundary line of surface ownership.  However, Mr. Sanders contends that a survey he had commissioned for purposes of mineral ownership should control in this case.  The survey to which he referred was conducted by another surveyor, Mr. Mark Tooke ("Tooke survey"), dated August 14, 2001.  (Def. Exh. 18).  Mr. Sanders contends that the Tooke survey accurately reflects the 36' MSL contour line in 1812, and therefore, properly marks the boundary between state and private mineral ownership.[8]

   Belle argues that the Third Circuit's opinion declares the 36' MSL contour line to be the proper boundary of surface and mineral ownership, and the *Heard/Daigre* survey line to be the correct 36' MSL contour line.[9]  The Heard/Daigre line is

---

[7] During 1941 and 1942, Dr. Richard J. Russel and Dr. Clair Brown conducted a study of the elevation of the shoreline of Catahoula Lake.  The findings of this study were memorialized in a report ("Russell/Brown report").  The report concluded that the 36' MSL contour line was the actual elevation of the shoreline of Catahoula Lake, and therefore, the 36' MSL contour line should be the dividing line between state and private ownership.  (Pl. Exh. 104-1).  In the Third Circuit litigation, tshe State relies upon the Russell/Brown report, and the Heard/Daigre survey as the definitive source for locating the 36' MSL contour line.

[8] Some evidence indicates that the Tooke survey accurately measured the 36' MSL contour line as it existed in 2001.  At trial, a surveyor with the State Land Office testified about a report of a survey that he and a colleague conducted on February 3-4, 2004.  The surveyor prepared a report of their activities.  (Pl.'s Exh. 160).  The report states that at least one point identified in the Tooke survey correctly marked the 36' MSL contour line.

[9] Before drilling its first well on SU 117, Belle received a location plat reflecting the Tooke line.  Belle representatives submitted this line to the Office of Conservation, which promptly rejected the Tooke line.  This prompted Belle to submit a plat reflecting the Heard/Daigre line.

8

substantially different from the Tooke line.[10]  SU 117 is a unit containing

approximately 60 acres of land.  Using the Heard/Daigre line, Mr. Sanders's royalty

interests are calculated based upon a 43-acre participation factor.  Adopting the

Tooke line would result in an increase of Mr. Sanders's participation factor in SU

117.[11]

The defendant in this case, Belle, was not a party to the Sanders litigation

resolved in the Third Circuit.  Indeed, the only two parties to the state court litigation

were Mr. Sanders and the State of Louisiana, Department of Natural Resources.  Just

as the State did not intervene in this lawsuit, so Belle did not intervene in the prior

litigation.  However, Mr. Sanders was a litigant in the state court proceedings, and

like the plaintiff in Williams, Mr. Sanders had a "full and fair opportunity to litigate"

the issues that he seemingly sought to reassert in this case.  See Williams v. Orleans

Levee Dist., 2010 WL 1302918, at *1.  In Williams, the court held that the plaintiff's

claims against the State were precluded under principles of collateral estoppel,

despite the fact that the State was not a defendant in the prior litigation.  Id.

Likewise, the Court finds that Mr. Sanders is barred from seeking a redetermination

of the 36' MSL contour line in this litigation against Belle, although Belle was not a

party to the Third Circuit litigation in which that issue was previously decided.[12]

---

[10]  Testimony from witnesses, including Mr. Tooke, confirmed that the Tooke line is different from the Heard/Daigre line.

[11]  At the time of trial, the potential increase in Mr. Sanders's royalty interest had not been calculated.

[12]  The Court has not considered whether a viable argument could be made in favor of Belle's being a "privy" or party whose interests were adequately represented by the State in the Third Circuit litigation.  In point of fact, the same conservation orders relevant in this case were at issue when the

9

A related question is whether we should reach a different conclusion concerning the issue of the *mineral boundary* in SU 117. We do not. Following the trial, the Court afforded both parties an opportunity to submit additional authorities on a number of specified points, one of which was whether the Court could fairly apportion mineral interests contrary to the 36' MSL contour line as established by Louisiana's Third Circuit. (Doc. 60). Mr. Sanders pointed to two Mineral Board Resolutions passed in 2002 (Joint Exhs. 6, 7) and two partial summary judgments rendered in the state district court (Pl. Exhs. 195, 196) as authority for his argument that we could apportion mineral interests differently from the appellate court's judgment. We now consider these authorities in turn.

First, nothing in the two Mineral Board resolutions indicates that the Heard/Daigre line should be replaced as the mineral boundary. The first resolution states that the Mineral Board recognizes, "for mineral rights only . . . a change in the 36 foot meander line of Catahoula Lake which would cut the state out of an existing producing [sic] currently known as the VUB [SU 116] . . . and lessen the State's participation in a proposed second unit currently known as the VUA [SU 117]." (Joint Exh. 6). The second resolution merely clarifies that the first was to be applied prospectively only, and was to impact SU 116 and SU 117 alone. (Joint Exh. 7). Neither called for a 36' MSL contour line different from that specified in the Heard/Daigre survey. As such, the two Mineral Board resolutions may arguably

---

Third Circuit determined that the 36' MSL contour line, as surveyed by Heard and Daigre, was the proper boundary line. That consideration was not argued by the parties, and is not necessary to our determination here.

indicate that there is a difference between surface and mineral ownership.  They do not, however, call for the placement of a boundary line different from the Heard/Daigre line.

Second, the two partial summary judgments in the state case referenced by Mr. Sanders do not mandate a deviation from the Third Circuit's decision.  The first judgment indicates that Mr. Sanders possesses and owns mineral rights of the lands above the 36' MSL contour line.  (Pl. Exh. 195).  The second declares Mr. Sanders owner of an undivided one-half mineral interest in certain lands in Sections 25 and 30.  (Pl. Exh. 195).  Mr. Sanders argues that these judgments were not challenged or overturned on appeal.  However, the appellate court, in its summary of the trial court proceedings, indicated that "the trial court limited Mr. Sanders' damages to any amounts of proceeds that the State has received from the granting of mineral leases and/or production of minerals . . . from the lands possessed by Mr. Sanders which were between the elevations of 36 feet MSL and 30.1 feet MSL."  See Sanders, 973 So. 2d at 879.  The trial court thus declared Mr. Sanders the owner of mineral rights up to the 30.1 MSL contour line, and in so doing, superceded its own two partial summary judgments in apportioning his damages.  That final judgment was reversed in its entirety by the Third Circuit court.  Even if that were not the case, however, neither summary judgment declared that the Tooke survey appropriately or correctly measured the 36' MSL contour line, or that the Heard/Daigre survey did not.

In summary, nothing before the Court supports a consistent dichotomy between surface and mineral ownership in this case.  More importantly, nothing

11

compels this Court to apportion mineral ownership in contravention of the Third Circuit's apportionment of ownership.  In overruling the trial court's judgment, the Third Circuit declared the boundary to follow the 36' MSL contour line "as surveyed by Heard and Daigre in 1942."  <u>Sanders</u>, 973 So. 2d at 887.  To repeat, we now rule in accord with the Third Circuit, and clarify that the court's declaration of the Heard/Daigre line as the 36' MSL contour boundary applies to both surface and mineral ownership.

2.    *The Reliability of the Heard/Daigre Survey*

Even if the Louisiana Supreme Court's decision in <u>Williams</u> did not bar Mr. Sanders's claims based upon collateral estoppel grounds, we conclude that the Heard/Daigre survey provides a proper demarcation of the boundary line in SU 117 separating state and private ownership.  Mr. Sanders made a number of tangential contrary arguments at trial, which we will address.

First, Mr. Sanders argued that the Heard/Daigre line was, at best, a meander line, and was not intended to represent a boundary or contour line.[13]  Mr. Sanders elicited testimony from a state land office surveyor which described, at least in general terms, the function of a meander line.  That surveyor posited that a meander line typically indicates the approximate location of a land and water boundary.  Other testimony confirmed that a meander line is used to locate the sinuosities of a body of

---

[13]  Mr. Tooke also testified that he believed the Heard/Daigre line to be a meander line, rather than a contour line, and that his contour line was drawn after an accurate survey of the elevation levels of the land, setting the 36' MSL contour.  Because the Heard/Daigre line is a straight diagonal line, Mr. Tooke opined that the line was not an actual representation of elevation levels, but was rather a meander line.

water, while a contour line is used to locate a particular elevation above some starting point (such as mean sea level).

In spite of these arguments, the Court has no definitive evidence that the Heard/Daigre survey was only a meander survey. Even if so, however, there is no point of law or evidence indicating that the Heard/Daigre line could not have represented, or since become, the mineral boundary line in SU 117. While the distinction between meander and boundary surveys is a valid consideration in ongoing land survey work, the circumstances of this case heavily diminish its importance.

As we have observed, the plaintiff requested a declaration that the Tooke survey is the mineral boundary in SU 117, and an order apportioning mineral interests in accord with that line. But, Mr. Tooke made clear in his testimony that the 36' MSL countour line set on his plat was based upon elevations and conditions as they existed in 2001, not in 1812. There is convincing evidence that the geography of SU 117 may have changed dramatically over 7 decades (not to mention the nearly 2 centuries since 1812). Testimony from a State Land Office Surveyor indicated that various factors could have affected the 36' MSL contour line, including hydrology, botany, manmade alterations, and the natural flow of streams into the area. The potential impact of these factors in the 70 years since the Heard/Daigre survey was conducted would be difficult, if not impossible, to contemplate. Thus, the Tooke survey can only represent what it measured: the 36' MSL contour line as it existed in 2001. That measurement is inappropriate; instead, the State's claim of ownership to

13

navigable water bottoms traces back to Louisiana's admission to the Union in 1812. See Gulf Oil Corp. v. State Mineral Bd., 317 So. 2d 576, 588-89 (La. 1975).  It is that date which is the understood universal benchmark.

Furthermore, Mr. Sanders candidly conceded two important points at trial. First, Mr. Sanders confirmed in testimony that he had already commissioned Mr. Tooke's survey of the 36' MSL contour line before Belle drilled a producing well on the leased property in SU 117.  Although Belle had drilled dry holes on SU 117 before, its first producing well was drilled in 2004, after Mr. Tooke's survey in 2001.  Therefore, Mr. Sanders had to be aware of the dispute between the Tooke and the Heard/Daigre surveys well before production began on the tract.

Second, Mr. Sanders acknowledged signing a division order in 2004 (Def. Exh. 14), allocating to him royalty interests based upon a participation factor drawn from the Heard/Daigre survey.  Although Mr. Sanders states that he took issue with the allocation of royalties even at that time, he nonetheless signed the division order and agreed to the royalty interest specified therein.[14]  That interest is based upon a roughly 43-acre participation factor in SU 117, which is in sum a 60-acre unit.  The order states that "[t]he undersigned [Mr. Sanders] warrants to [the payor] ownership of the interest indicated below . . . and directs [the payor] to distribute payment for such oil as provided below." (Def. Exh. 14).  The division order also includes a provision requiring Mr. Sanders to notify the payor in writing of any change in his interest, and to indemnify and hold the payor harmless "for any claims arising from

---

[14] Mr. Sanders explained that he, like any other litigant, had to decide whether he had the time and the resources to file a lawsuit, which is why he delayed in instituting this proceeding.

14

[his] failure to provide written notice." (Def. Exh. 14).  Instead, Mr. Sanders accepted

the allocation of royalties from production on SU 117, and the royalties themselves,

until he filed the instant suit.

Next, Mr. Sanders questioned whether the Heard/Daigre survey was

performed by licensed surveyors, signed as such, and recorded with the State Land

Office and/or in the district clerk of court's office as the state's official boundary

survey.  There was at least some testimony indicating that Heard and Daigre were

registered land surveyors.  Moreover, there is no legal authority which indicates that,

had Heard and Daigre not been licensed, and not signed their work, their survey

would have been void under the law as it stood in the 1940s.  Finally, under the

"ancient documents rule," the Heard/Daigre survey is entitled to a presumption of

genuineness and execution, as it has been recorded and relied upon for a period well

in excess of thirty years.[15]  As such, this argument is without merit.

There is a strong public policy interest in bringing an end to boundary

---

[15] Under La. R.S. § 13:3729,

[a]n ancient document is defined to mean any instrument of writing, including maps, plats and surveys, which has been recorded in the conveyance, mortgage, donation, miscellaneous or other official records of any parish of the state or in any office, bureau, department or agency of the state for a period of thirty years or more at the time such instrument is offered in evidence.

Moreover, in Louisiaiana, "[i]t shall be unnecessary for any ancient document . . . to be acknowledged or proven as provided by any act, statute or other law of the state in order for such ancient document to be admitted in evidence, and it shall be unnecessary to prove the execution of such document."  Id. § 13:3730.  Under these statutory principles, an ancient document, such as the Heard/Daigre survey, is entitled to "a prima facie presumption of the execution and of the genuineness of such instrument."  Id.; see also Schmit v. St. Bernard Parish Police Jury, 504 So. 2d 619, 622-23 (La. App. 4th Cir. 1987) (holding that a reconstructed subdivision map recorded in the notarial archives for more than 30 years "qualifies as an ancient document under La. R.S. 13:3729 . . . . [and] [t]here is thus a prima facie presumption of the execution and genuineness of the instrument.").

15

disputes such as the one in the instant case.  Indeed, it would seem that the Third

Circuit's opinion (and the litigation that was brought to an end by it) was intended to

constitute a final resolution of the boundary dispute between private landowners and

the State.  The nature of this lawsuit compelled the Court to revisit the issue, only to

lead to the same conclusion.  The Heard/Daigre survey, be it a meander survey or a

boundary survey by nature, has long been and has now become the authoritative

boundary marker in SU 117.  Mr. Sanders's royalty payments are based upon acreage

calculations appropriately made using the Heard/Daigre line.  Therefore, Mr. Sanders

is not entitled to a judgment reapportioning his royalty interests relative to SU 117.

    **B.**    **The 20-Acre Provision**

       *1.*   *Background*

In this case, the Lease provided Belle with the option of voluntarily pooling the

covered acreage with other lands:

> Lessee is hereby granted the right as to all or any part of the land
> described herein, without Lessor's joinder, to combine, pool or unitize
> the acreage royalty or mineral interest covered by this lease, or any
> portion thereof, at any time during the life of this lease, with any other
> land, lease or leases, royalty or mineral interests in or under any other
> tract or tracts of land in the vicinity thereof, whether owned by Lessee
> or some other person, or corporation so as to create, by the combination
> of such lands and leases, one or more operating units, as to any and all
> mineral horizons, provided that no one operating unit shall . . . in the
> case of oil . . . embrace more than eighty (80) acres . . . .

(Joint Exh. 1).  Mr. Sanders relies upon a single sentence in Exhibit A to the Lease as

the basis for his claims pertaining to SU 118, which we have referred to as the 20-acre

provision: "In the event of pooling each unit must contain a minimum of 20 acres of

the lands described above unless Lessee receives prior written consent from Lessor."

16

(Joint Exh. 1, Exh. A).  Belle representatives testified that they recognized their obligation to fulfill the 20-acre provision in any voluntary units created under the Lease.  In fact, in two 40-acre pooled units formed by Belle voluntarily, and agreed upon by Mr. Sanders, at least 20 acres of Mr. Sanders's land were included.  (Joint Exhs. 3, 4).  However, Belle maintains that the Lease's 20-acre provision did not apply to compulsory units created by the Commissioner.  Mr. Sanders argues to the contrary that the formation a compulsory unit does not nullify the terms of a private lease, including clauses like the 20-acre provision.  To resolve the dispute on this point, the expanded history of unitization is in order.

On February 14, 2002, by Order No. 773-F-8 ("Order"), the Commissioner created 7 new drilling units in the Catahoula Lake Field, which were deemed "necessary to insure [sic] orderly development, to prevent waste, and to avoid the drilling of unnecessary wells."  (Joint Exh. 5).[16]  Specifically, the Order created sand units 116 through 122 pursuant to a plat submitted by Belle.[17]  Perhaps most importantly, however, the Order contained the following provision:

> The separately owned tracts, mineral leases and other property interests within the units created herein are hereby pooled, consolidated, and integrated in accordance with Section 10, Title 30 of the Louisiana Revised Statutes of 1950, *with each tract sharing in unit production in the proportion that the surface area of each such tract bears to the entire surface area of the unit in which it is situated.  Also,*

---

[16] The Order was issued upon application by Belle, and after a public hearing held on January 8, 2002.

[17] The Order noted that "each of said units can be efficiently and economically drained by one well, and that the creation of such units should reasonably assure to each separate tract included therein the opportunity to recover its just and equitable share of the contents of the reservoir."  (Joint Exh. 5).  In other words, the Order was issued for the purpose of preventing waste and efficiently draining the available oil supply.

17

> *all operations on and production from the units shall be considered operations on and production from each of the separate tracts within said units and under the terms of each of the mineral leases affecting said tracts.*

(Joint Exh. 5, p. 2).

By a letter date June 13, 2006 (Joint Exh. 8), Mr. Sanders, through his legal counsel, made a demand for payment of royalties based upon a 20-acre participation factor in each of the units in which his land was situated.  Legal counsel for Belle responded that, although SU 118 contained approximately 4 acres of land owned by Mr. Sanders and Mr. Shirley (and thus did not satisfy the 20-acre provision), "Belle . . . is of the opinion that the establishment of government drilling and producing units . . . supercedes any agreement which they may have had with Sanders/Shirley insofar as acreage contribution to these units may be applicable, and that they have been prevented by government action from complying with the provisions thereof."  (Joint Exh. 9).  This remains Belle's position at present.

At play in this case are three interrelated sources of authority: the Commissioner's Order, the clause in the Order ostensibly leaving in place the terms of private agreements, and the Lease signed by the litigants in this case.  The question before the Court is which of these sources of authority governs the apportionment of royalties in SU 118.  The Court finds that the units formed by the Commissioner's Order are controlling with respect to the division of mineral interests in this case.

　　　　　2.　　　*The Issue of "Waiver"*

Counsel for the defense elicited testimony from Mr. Sanders regarding whether

18

he opposed the creation, drawing, or apportionment of royalties on SU 118.  Mr.

Sanders responded with the following statements during the course of his testimony:

(1) he did not oppose the creation of the unit at a pre-application conference that was

held with Mr. Sanders in attendance; (2) he did not contact Belle voicing opposition to

the creation of the unit; and (3) he did not appear at the public hearing prior to the

creation of the compulsory unit by the State.  The Court must decide whether these

omissions by Mr. Sanders constituted a waiver of his right to challenge the

apportionment of royalties on SU 118.

As a general rule, mineral lessors may not collaterally attack a Commissioner's

order.  See Trahan v. Superior Oil Co., 700 F.2d 1004, 1016 (5th Cir. 1983); see also

Mayer v. Tidewater Oil Co., 218 F. Supp. 611, 612 (W.D. La. 1963) ("[W]hen evidence

is submitted, [the Commissioner's] judgment and the order is then binding . . . and is

subject to attack (after the parties have exhausted the administrative remedy before

him) not by a collateral suit as the one now before this Court but in the manner

provided by [statute].").  This prohibition extends well beyond a direct or facial

challenge to the validity of the order:

> The application of this rule prohibiting "collateral attack" of an order of
> the Commissioner is not limited to suits in which the judgment will
> directly affect actual enforcement of, or compliance with, the
> Commissioner's order, such as suits by or against the Commissioner, or
> suits between private parties for injunctive relief requiring of one party
> conduct or inaction which will, in fact, violate an order of the Commissioner. Rather,
> the rule also extends to suits between private parties in which a particular order of
> the Commissioner is an operative fact upon which the determination of the parties'
> respective rights directly depends, even though all relief sought can be given, such
> as by money damages or lease cancellation, without thereby causing any actual
> violation of the Commissioner's order. Thus, where the lessee has drilled on a unit
> established by the Commissioner and including the leased land, the lessor, in a suit

19

to cancel the lease for want of production or for damages under a compensatory royalty clause respecting off-lease production, is prohibited from challenging the validity of the Commissioner's unit order.

Trahan, 700 F.2d at 1015-16; see also Pierce v. Goldking Properties, Inc., 396 So. 2d 528, 533 (La. App. 3d Cir. 1981) (holding that any defective performance by a mineral lessee who allegedly failed to properly unitize and develop leased land "had already been remedied by [a] Commissioner's order" unitizing the leased land).  Moreover, the rule applies where the lessor claims that "the orders forming the respective units for the offending wells wrongfully excluded their lands."  Trahan, 700 F.2d at 1016. Finally, where a matter has been presented to and acted upon by the Commissioner, the collateral attack rule applies; but "where the matter does not come before the Commissioner, then the collateral attack rule is inoperative and does not prohibit the lessor from showing that if the matter had been brought before the Commissioner he would probably have acted on it and have done so with a particular result."  Id. at 1020-21.

To the extent that Mr. Sanders's arguments drew into question the propriety of the Commissioner's order in any form, his arguments at trial were precluded by the collateral attack rule.  More specifically, Mr. Sanders's suggestions that SU 118 may have been drawn differently, so as to include more of his own land, are, at this point, waived and futile.  Furthermore, Mr. Sanders failed to identify pertinent information that should have been presented to the Commissioner by Belle.  As such, there are no matters in dispute which did not come before the Commissioner that may support Mr. Sanders's claims in this case.

20

By his own account, however, Mr. Sanders did not take issue with the Commissioner's Order.  Rather, he accepts the Order, and instead merely seeks enforcement of the 20-acre provision in the Lease.  Therefore, the only remaining question is whether the 20-acre provision may be properly enforced in conjunction with, or in lieu of, the Commissioner's order.

3. _Compulsory Units_

The Commissioner serves as the head of the Louisiana Department of Conservation.  La. R.S. § 30:1.  "For the prevention of waste and to avoid the drilling of unnecessary wells," the Commissioner is authorized by statute to establish "a drilling unit or units for each pool."  Id. § 30:9(B).  The term "pool" is defined, in part, as "an underground reservoir containing a common accumulation of crude petroleum oil or natural gas or both."  Id. § 30:3(6).  The term "drilling unit . . . means the maximum area which may be efficiently and economically drained by one well."  Id. § 30:9(B).  The Louisiana Supreme Court summarized the role and authority of the Commissioner as follows:

> The Department of Conservation was created by the Constitution of 1921 for the sole purpose of protecting, conserving, and replenishing the natural resources of this state, and the authority of the legislature to enact, and of the Commissioner of Conservation to enforce, is specifically limited to those measures that do 'protect, conserve and replenish the natural resources of the State, and . . . prohibit and prevent the waste or any wasteful use thereof.'

Ark. La. Gas Co. v. Sw. Natural Prod. Co., 60 So. 2d 9, 11 (La. 1952) (quoting La. Const. of 1921, art. VI, § 1).

Mr. Sanders cites decisions which indicate that, under certain circumstances,

21

a Commissioner's unitization or pooling orders do not usurp the provisions of a valid lease as they apply to the allocation of mineral interests among private contracting parties.[18] The Court is aware of other authority supporting the general notion that royalty distributions, as determined by private leases, may remain, under certain circumstances, unaffected by orders from the Commissioner.  See, e.g., Crow Drilling & Producing Co. v. Hunt, 226 So. 2d 487, 494 (La. 1969) ("When the lease owners fix the distribution of production from a well by contract, the distribution is neither altered nor abrogated by such a conservation order.").

However, the Louisiana Supreme Court has clearly modified this proposition as follows: "[P]rivate contractual rights in these leases are only superseded when they are in conflict with the valid orders of the Commissioner of Conservation, i.e., when the order is a conservation measure, pure and simple."  Monsanto, 102 So. 2d at 227. More recent authority is in accord.[19]  Stated another way, "the orders of the

---

[18] See Dillon v. Holcomb, 110 F.2d 610, 611 (5th Cir. 1940) ("In relation to royalties, overriding royalties, and oil payments, the authority of the conservation commissioner or of any lessee to pool or allocate acreage is subject to the terms of the contract of lease existing between the lessor and lessee."); Monsanto Chem. Co. v. S. Natural Gas Co., 102 So. 2d 223, 226-27 (La. 1958) (holding that a Commissioner's order severing a portion of a tract from a leased production unit did not alter or destroy the rights of the private parties to the mineral lease contracts); Ark. La. Gas Co., 60 So. 2d at 11 (holding that a Commissioner's order "did not intend to, and did not, in fact, abrogate the contracts between the several lessors and their respective lessees with respect to the nature or structure of their mineral ownership, or alter in any way the consideration to be paid and the method of payment").

[19] See JHJ Ltd. I v. Chevron U.S.A., Inc., 617 F. Supp. 729, 732 (M.D. La. 1985) ("[O]rders issued by the Commissioner of Conservation within the area of his delegated authority nullify and supercede private contractual rights which are in conflict with those orders."); United Gas Pipe Line Co. v. Watson Oil Corp., 306 So. 2d 731, 735 (La. 1975) ("[P]rivate contractual rights are superseded when in conflict with a valid order of the Commissioner."); Frey v. Miller, 167 So. 2d 669, 669 (La. 1964) ("[P]rivate contracts involving mineral rights are only superseded when they are in conflict with the valid orders of the Commissioner of Conservation, i.e., when the order is a conservation measure, pure and simple."); Kaiser Aluminum Exploration Co. v. Celeron Oil and Gas Co., 526 So. 2d 374, 377-78 (La. App. 4th Cir. 1988) ("[P]rivate contractual rights are only superseded when they are in conflict with valid orders of the Commissioner of Conservation.").

22

Commissioner supersede, supplement, replace and are incorporated in the provisions and obligations of contracts and leases relating to mineral development. . . . [and] these orders become the law as between the parties in determining their respective rights and obligations." Delatte v. Woods, 94 So. 2d 281, 287 (La. 1957).

The cases cited by Mr. Sanders involve situations in which the terms of mineral leases were unaffected by the Commissioner's orders, or were enforceable in conjunction with those orders.  These cases did not involve lease terms which directly conflicted with the apportionment of acreage in an order by the Commissioner.  For instance, in Monsanto, several oil and gas lease owners agreed to combine their respective interests on a particular tract of land, which would be developed for their joint benefit.  102 So. 2d at 224.  Subsequently the Commissioner issued an Order which formed a larger compulsory unit, severing a portion of the owners' tract from the compulsory unit which was owned by the defendant owners, and not the plaintiff owners.  See id.  The court held that the agreement between the owners did not conflict with the Commissioner's order, and therefore was not usurped by it, meaning that the owners shared in production from the compulsory unit under the terms of their agreement.  See id. at 226-27.

In this case, however, no provision in the lease impacted the shares of surface or mineral ownership among private parties, nor how production proceeds were to be distributed among the owners.  Mr. Sanders had leased to Belle "all of the land and mineral interest owned or claimed by Lessor in Section 25 . . . and Section 30."  (Joint Exh. 1, Exh. A).  In the Lease, Mr. Sanders granted Belle the right to voluntarily pool

23

acreage, and if Belle chose to do so, required Belle to include 20 acres of the leased land within any such voluntary unit.  Unlike the circumstances in <u>Monsanto</u>, where the owners agreed to share in the development of one tract in spite of the Commissioner's order, no such agreement was signed in this case.  Rather, Mr. Sanders's complaint on this point relates only to the number of acres upon which he is being paid royalties.  His claim to payments based upon a 20-acre participation factor would therefore contradict the Commissioner's order.[20]

Here, the Commissioner formed a unit which presented an irreconcilable conflict with the 20-acre provision; specifically, one that related to the inclusion of acreage in a unit, rather than the division of royalties from production in the unit. This dispute compares more closely to the circumstances in <u>Humble Oil Refining Co. v. Jones</u>, where the court held that an order of the Commissioner establishing a

---

[20] In <u>Dillon</u>, another case cited by Mr. Sanders, the plaintiff-leaseholder was entitled to an overriding royalty and lump sum payment under the terms of his lease.  110 F.2d at 610-11.  When the plaintiff's tract was pooled with the defendants' tract by the Commissioner, the court held that the plaintiff was entitled to be paid under the terms of his own lease, rather than the defendants' lease. <u>See id.</u>  Moreover, in <u>Ark. La. Gas Co.</u>, the court framed the issue as follows: "Are the royalty owners throughout the [640-acre Commissioner's] unit entitled to be paid on the basis of the return from the sale of all gas and distillate produced from the unit, or only on the basis of the amounts realized by their own lessees from the sale of the proportion of the production allocated to the tract in which they have an interest?"  60 So. 2d at 9.  The court held that "the royalty owners in this [Commissioner's] unit are entitled to be paid from the proceeds realized from the share of the production of this well allocated to the tracts in which they have an interest, as specifically provided in their individual contracts." <u>Id.</u> at 11.  The Commissioner's order had "no other effect than to allocate to each tract its pro rata share of the production from the entire unit, based on the proportion the acres contained in the individual tract bears to the total number of acres in the unit." <u>Id.</u> at 10.  The Commissioner's order did not alter the allocation of mineral ownership, and each royalty owner retained an interest only in the production attributable to the tract in which the owner had an interest. <u>Id.</u> at 9-11.  Neither case is availing to Mr. Sanders's position here, as neither states that a lessor is entitled to be paid royalties based upon acreage which the Commissioner excluded from a compulsory unit merely because the lease specified that any voluntarily pooled units must contain 20 acres of the lessor's land.  More particularly, the royalty owners in both cases were entitled to payments under the terms of their respective leases only because they did not conflict with the Commissioner's orders, and only as to leased land which was included in the compulsory units.

24

compulsory unit usurped the terms of a mineral lease agreement.  125 So. 2d 640 (La.

App. 3d Cir. 1961).  In that case, the compulsory unit formed by the Commissioner

included some lands that did not fall within the lease, and excluded some lands that

were included in the lease.  Id.  The original lease provided the lessee with the power

to pool the leased acreage with other lands or leases when to do so would be, in the

lessee's judgment, necessary to promote conservation.  Id. at 641.  The lessee

exercised this option and pooled the leased land with other lands to form a combined

unit.  Id. at 642.  Subsequently, upon application by the lessee, the Commissioner

formed a compulsory unit which included only part of the leased tract.  Id.

No provision in the lease in Humble Oil indicated an intent by the lessor to

freeze his royalty interest upon the formation of a voluntary unit.  Id. at 647.[21]

Ultimately, the court held that when "the Commissioner has found the true

participations. . . . the parties should not be presumed to have agreed to share their

interest on the old declared unit unless they show a specific and positive intention to

freeze the old unit."  Id. at 646.  Finding no intent to freeze the voluntary unit

participations, and noting that allowing the lessee to collect royalties based upon the

voluntary unit acreage "would also allow landowners whose lands are not within an

oil or gas reservoir to participate in royalties to which they are not entitled," the court

---

[21]  More specifically, the court held:

It does not appear to this Court that the lessor could be said to have frozen his royalty
interests in the voluntary unit unless he so declared it. The very
purpose for which a lessor signs an individual lease contract with his lessee with a
pooling agreement therein is for the purpose of getting his equitable and just share of
oil and gas in the pool and to prevent drainage of his land.

Humble Oil, 125 So. 2d at 647.

held that the Commissioner's order displaced the terms of the lease.  Id. at 648.

Similarly, no provision of the Lease in this case expressed an intent to freeze Mr. Sanders's interests in any unit to be formed by the Commissioner.  Rather, the Lease only imposed a unilateral obligation upon Belle to include 20 acres of leased land within any pooled units that it chose to form[22]  When lands in SU 118 were voluntarily pooled, the voluntary pooling agreement specifically excepted from its "freeze" provision "units formed as commissioner's conservation units." (Joint Exh. 4).  In fact, the voluntary pooling agreement specifically provided that it was not "intended to imply that the area comprising such unit will, or will not, be efficiently and economically drained by one well," or that development under the agreement was intended to represent a measure of the "proper development of [the leased] property." (Joint Exh. 4).  Neither this Lease nor the one considered in Humble Oil reserved the lessor's royalty interests in spite of the Commissioner's orders.  Moreover, the fact that the lessee in Humble Oil applied to the Commissioner for a unitization order, just as Belle did in this case, was not relevant to the court's determination.

---

[22] Although the Lease does not make specific reference to orders by the Commissioner, our interpretation here (that the 20-acre provision applies only to units formed voluntarily) is the only logical one.  No provision of law authorizes a private producer, such as Belle, to force or dictate the formation of compulsory units by the Commissioner.  To the contrary, the Commissioner is to consider "all available geological and engineering evidence," such as that provided by Belle to the Commissioner in this case, "and shall provide for the unit well to be located at the optimum position in the drilling unit for the most efficient and economic drainage of such unit." See La. R.S. § 30:9(C).  In other words, while a developer may request unitization, and may provide the Commissioner with geological and engineering evidence, the ultimate authority to form a compulsory unit rests with the Commissioner.  Thus, Belle only had the authority to include 20 acres of Mr. Sanders's land within a unit formed voluntarily.  Belle could never have properly agreed to the 20-acre provision relative to compulsory units.

26

In sum, the 20-acre provision in this case did not specify that it was applicable to any units other than those formed voluntarily. Any attempt to apply the provision to compulsory units would contravene the Commissioner's statutory authority to make final determinations as to the proper unitization strategy for conserving natural resources. The 20-acre provision, then, conflicts with the Commissioner's expressed determination of the most effective means to prevent "waste and to avoid the drilling of unnecessary wells." La. R.S. § 30:9(B). Moreover, enforcement of the 20-acre provision here would result in the improper payment of royalties to Mr. Sanders based upon acreage which does not fall within SU 118. Therefore, in this case, we determine that the Commissioner's Order usurped the 20-acre provision in the Lease, and Mr. Sanders is not entitled to relief based upon that provision.

### C.    The Failure to Maintain Seals

As a completely separate claim for recovery against Belle, Mr. Sanders contends that Belle has failed to maintain proper seals on its tank valves. The seals in question basically consist of a piece of aluminum which is placed on an oil tank's valve handle. This seal will be broken when the handle is disconnected, providing evidence that the valve has been opened. Mr. Sanders requests the right to audit Belle's records to determine if any oil has been improperly removed from any of the valves on land covered by the Lease.

In support of his request, Mr. Sanders relies upon a May 26, 2005 Compliance Order issued by the Commissioner. (Pl. Exh. 221). The order recounted an incident during which approximately sixty barrels of crude oil were improperly removed from

27

one of the tanks on the leased property. However, Belle responded to the Commissioner's order by submitting a detailed explanation of the removal and evidence of transactions associated with this process. The Commissioner did not assess a civil penalty for Belle's actions. Moreover, Belle submitted a letter from Mr. Shirley, in which Mr. Shirley stated that he was completely satisfied with Belle's efforts in resolving the situation. Finally, Mr. Sanders's own witness admitted during cross examination that there was no indication during his inspection of the valves that any oil was improperly taken from the leased property. In short the evidence indicates that the incident regarding pre-2005 improper removal of oil from the leased premises was resolved. This set of circumstances warrants no other relief.

There is likewise no indication of malfeasance during the period between 2005 and the time of trial. Mr. Sanders elicited testimony from a consulting engineer who visited the tanks on SU 116, 117, and 118 several times during 2007 and 2008. The engineer found, in summary, that seals were properly placed on the valves at some points, and were not properly placed on those valves at other points.[23] However, a Belle lease operator testified that typically, the transporter, rather than the lessee (in this case, Belle), is responsible for maintaining the seals, and that, given the transporter's discretion, many other valves in the LaSalle Parish area do not have such seals. Nonetheless, after the issuance of a compliance order by the

---

[23] This failure to maintain seals on the tank valves, the engineer testified, contravenes the Commissioner's compliance order.

Commissioner, Belle personnel took the initiative to replace the seals.[24]

The lease operator also testified that, at each transaction, a record is kept which allows him to trace the oil sold and remaining in the tanks.  This record is commonly referred to as a "run ticket," and would allow a royalty owner, for instance, to track all transactions made as to each tank in which the owner had an interest. Mr. Shirley long ago provided a jar in which run tickets are deposited by the transport drivers for his review, but Mr. Sanders declined to do so.

The evidence before the Court indicates that the failure to maintain seals properly is the principal responsibility of the transporter, rather than producers such as Belle.  Moreover, testimony confirmed that the absence of seals does not indicate that oil has been misappropriated, and that interested royalty owners may track the flow of crude oil from tanks on their leases by requesting copies of run tickets.  There is no affirmative evidence that any oil was misappropriated.  Given these facts, the Court finds that Mr. Sanders is not entitled to an audit of Belle's records. He is, however, entitled to view or have examined all available run tickets.  Likewise, nothing here prevents the right to request a future audit on oil extraction issues, if warranted based on other facts not at issue here.

D.    **Motion to Hold Record Open**

Finally, shortly before trial, Mr. Sanders filed a Motion to Hold Record Open to Certify Questions to the Louisiana Supreme Court (Doc. 55).  This motion stated that

---

Admittedly, Belle has begun to maintain the seals on the valves only after the Commissioner's compliance order. The lease operator was hired just prior to the filing of the complaint against Belle in 2005, and thus, could not testify as to whether the seals were maintained prior to 2005.

29

some of the exhibits to be offered for admission as evidence at trial may have drawn objections from the State of Louisiana.  Mr. Sanders requested that the Court receive the exhibits, note any such objections, and certify questions to the Louisiana Supreme Court regarding admissibility of the exhibits if necessary. The requested procedure is doubtful.  Nevertheless, the evidence in the case having been closed, and no objections having been filed, this motion is appropriately DENIED AS MOOT.

**III.    Conclusion**

For the foregoing reasons, and after careful consideration of the testimony, evidence, and legal authorities presented to the Court, the Court finds that Mr. Sanders is not entitled to the relief requested in his pleadings.  A separate judgment will be issued accordingly.

SIGNED on this 30th day of April, 2010, at Alexandria, Louisiana.

DEE D. DRELL
UNITED STATES DISTRICT JUDGE

30